

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JOSE ALEJANDRO CASAS, | § | No. 08-22-00109-CR |
| Appellant, | § | Appeal from the |
| v. | § | 34th Judicial District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20190D04554) |

## **O P I N I O N**

### BACKGROUND

In five issues, Appellant Jose Alejandro Casas, challenges his conviction of murder. TEX. PENAL CODE ANN. 19.02(c). For the reasons that follow, we affirm.

### *Factual Background*

On July 13, 2019, Santana Castro (Santana), was found deceased in her home. An autopsy was performed, and the deputy medical examiner concluded Santana died of a gunshot wound to the head and determined the manner of death as a homicide. The deputy medical examiner testified there was no evidence to suggest the manner of death was a suicide.

In the early afternoon on the day of the murder, Santana's mother left the home she shared with Santana and Santana's brother, Raymond Castro (Raymond). As Raymond was getting ready

to shower, Santana and Appellant walked into the house through the front door. Shortly after, Raymond, Santana, and Appellant, smoked a marijuana joint together inside Santana's car, which was parked at the house. Appellant and Santana were dating at the time, and Raymond recalled that "the energy in the car seemed a bit off[.]" After they finished smoking, Santana and Appellant went inside the house together, and Raymond went inside to his room. Raymond proceeded to leave the house to run some errands, but before he left, he asked Santana if she was okay. Santana said she was. Raymond then left the house and returned at around 4 p.m.

When he entered and walked through the house, Santana's bedroom door was wide open, and he saw Santana's body. It was not initially apparent to Raymond that Santana had been shot or that she was deceased, until he saw her brain matter on the floor. No one else was in the house at the time, and according to Raymond, the last person with Santana was Appellant.

At trial, a total of 25 witnesses testified, ranging from several of Santana's family members and friends, the deputy medical examiner who performed Santana's autopsy, several responding officers, detectives, and investigators who worked on the case, along with proffered firearm and crime scene experts. The State's theory was that in the totality of the circumstances, there was sufficient evidence to prove, beyond a reasonable doubt, that Appellant murdered Santana. The defense presented several theories—1) Santana committed suicide, but if jury found that she did not commit suicide, then 2) her brother Raymond killed her, but if the jury found that the aforementioned did not occur, then either 3) Santana must have shot herself in an accidental discharge, or 4) her brother Raymond accidentally shot her.

### Procedural Background

Appellant was charged by indictment with murder, alleged to have occurred in El Paso County, Texas, on or about July 13, 2019. Trial began on May 2, 2022 and concluded on June 14,

2

2022. The jury found Appellant guilty and assessed punishment at 47 years' confinement in the Texas Department of Criminal Justice, Institutional Division. This appeal followed.

## DISCUSSION

In five issues, Appellant challenges his conviction of murder. In Issues One and Two, Appellant argues the State failed to prove venue and that the offense occurred in the State of Texas. In Issue Three, Appellant claims he received an unfair trial due to alleged prosecutorial misconduct. In Issue Four, Appellant challenges the admission of evidence. Finally, in Issue Five—raised in a supplemental brief—Appellant claims the trial judge's bias deprived him of due process and a fair trial. We affirm.

## VENUE

In Issues One and Two, Appellant challenges venue. In Issue One, Appellant claims the State failed to prove venue in El Paso County. In Issue Two, Appellant alleges the State failed to prove the offense occurred in the State of Texas. We disagree.

### *Standard of Review and Applicable Law*

Failure to prove venue in the county of prosecution constitutes reversible error. *Lozano v. State*, 958 S.W.2d 925, 929 (Tex. App.—El Paso 1997, no pet.). However, venue is not a "criminative fact" and thus does not constitute an element of the offense. *Id.* Accordingly, venue need not be proved beyond a reasonable doubt, but rather, by a preponderance of the evidence. *Id.* Proof of venue may be established by either direct or circumstantial evidence. *Id.*

Rule 44.2 of the Texas Rules of Appellate Procedure establishes that, "Unless . . . disputed in the trial court, or unless the record affirmatively shows the contrary, the court of appeals must presume . . . that venue was proved in the trial court." TEX. R. APP. P. 44.2(c)(1). Accordingly, as a threshold matter, a challenge to proof of venue for the first time on appeal will not be entertained.

*See Puryear v. State*, 428 S.W.2d 345, 347 (Tex. Crim. App. 1968) (overruling appellant's contention that the State failed to prove the offense occurred in Texas and failed to prove venue because no issue was made as to venue in the court below, and the indictment was returned and trial was had in county of conviction); *see also Carpenter v. State*, 333 S.W.2d 391, 393 (Tex. Crim. App. 1960) (contention that venue was not proved "was raised for the first time after verdict, and this Court will presume that venue was proved.").

*Analysis*

Appellant claims he twice timely moved for a directed verdict of acquittal, thus challenging venue at trial. Appellant is misguided. In the first instance, Appellant requested a directed verdict:

> Your Honor, at this time the defense would make a motion for a directed verdict in this matter. We do not believe that the case -- that the State has made its case to prove what it has alleged in the indictment, Your Honor. We do not believe that there's sufficient evidence that has been presented to the Court to prove its case beyond a reasonable doubt. We do not believe that the State has proven its case with each and every element of the indictment, Your Honor. And for that reason, Your Honor, we'd ask for a directed verdict, Your Honor.

In the second instance, Appellant renewed his request for a directed verdict: "We will renew our -- is it at this time that we should renew our motion for a directed verdict[.]"

It is apparent Appellant did not challenge venue in either of these two instances—his motion and renewed motion for directed verdict. Furthermore, our independent review of the record, outside of these two instances, shows Appellant did not once challenge venue, by verbal or written motion, or otherwise. Appellant produced no evidence to suggest venue in El Paso County was improper. The case was indicted in El Paso County, and the indictment specifically alleged:

> [O]n or about the 13th day of July, 2019 . . . in the County of El Paso and State of Texas, JOSE CASAS, hereinafter referred to as Defendant, . . . [d]id then and there

4

intentionally or knowingly cause the death of an individual, namely, SANTANA CASTRO, by shooting SANTANA CASTRO with a firearm[.]

The trial was thereafter held in El Paso County, Texas, and Appellant was convicted in El Paso County, Texas.

Moreover, the record is replete with evidence that the murder occurred at 2503 N. Piedras, which is in El Paso County, Texas. Testimony from several responding law enforcement officers confirmed the murder occurred at 2503 N. Piedras, which was where responding officers were dispatched to, where Santana's body was found, and where the crime scene investigation was conducted. Santana's sister also provided testimony confirming the address as 2503 N. Piedras. A forensic scientist who tested blood found on the front door of the house where the murder occurred also confirmed the address as 2503 N. Piedras. Additionally, the autopsy report itself also shows it was generated by the Office of the Medical Examiner for the County of El Paso, Texas, and the autopsy was performed at the County of El Paso Office of the Medical Examiner and Forensic Laboratory. We find there is ample evidence the murder of Santana occurred in El Paso County, Texas.

Accordingly, because venue was not disputed in the trial court, and because the record establishes, by a preponderance of the evidence, that the murder occurred in El Paso County, Texas, we overrule Issues One and Two.

## PROSECUTORIAL MISCONDUCT

In Issue Three, Appellant complains of two instances of alleged prosecutorial misconduct, which according to Appellant, warrant a new trial. We disagree.

5

### Standard of Review and Applicable Law

To preserve error in cases involving prosecutorial misconduct, the appellant must have (1) made a timely and specific objection; (2) requested an instruction that the jury disregard the matter improperly placed before the jury; and (3) moved for a mistrial. *Jimenez v. State*, 240 S.W.3d 384, 402 (Tex. App.—Austin 2007, pet. ref'd). However, error preservation is not required, only in cases where, the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). The misconduct must have denied the defendant a fair trial. *Id*. "It is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id*. (quoting *Darden*, 477 U.S. at 181). Prosecutorial misconduct does "not assume constitutional dimension unless the evidence is 'so insubstantial that (in probability) but for the remarks no conviction would have occurred.'" *Id*. (citations omitted); *Edwards v. Scroggy*, 849 F.2d 204, 211 (5th Cir. 1988).

### Analysis

As a threshold matter, we must first determine if Appellant has preserved error. The State contends Appellant has waived his complaints of prosecutorial misconduct by failing to conform his objections at trial to complaints of prosecutorial misconduct. We agree that Appellant waived any complaint concerning prosecutorial misconduct.

#### 1.    Sidebar Objection

The first instance of alleged prosecutorial misconduct occurred during the testimony of Sergeant Mark Fernandez of the El Paso Police Crime Scene Unit. The following occurred:

| | |
|---|---|
| The State: | I'll ask a different question. Having worked both sides, as a crime scene investigator and also as a detective -- |
| Defense Counsel: | Objection, Your Honor. That's the same side. |

6

| The State: | Of the investigations. |
|---|---|
| The Court: | No. You remember CAP [Crimes Against Persons], when you brought up the CAP? And then there's crime scene. Two different. |
| Defense Counsel: | No. Same side. |
| The Court: | Well -- well -- |
| The State: | *Law enforcement, still on the side of the good guys, but different* -- (emphasis added) |
| Sergeant Fernandez: | One's – |
| The State: | -- side of the investigation; right? |
| Sergeant Fernandez: | Right. |
| Defense Counsel: | Objection to the sidebar. |
| The Court: | All right. Overruled. Go ahead. |

Appellant objected to sidebar at trial, and now on appeal, argues prosecutorial misconduct because the prosecutor was attempting to bias the jury by claiming Sergeant Fernandez was one of the good guys, which according to Appellant, imputed guilt upon him. We do not find Appellant's trial objection specific—Appellant's objection at trial, which was to an alleged sidebar remark, does not comport with his complaint on appeal, that the remark was prosecutorial misconduct that imputed guilt upon him. Furthermore, Appellant did not request an instruction that the jury disregard the remark and Appellant also did not move for a mistrial. *See Jimenez*, 240 S.W.3d at 402 ("To preserve error in cases involving prosecutorial misconduct, the defendant must (1) make a timely and specific objection; (2) request an instruction that the jury disregard the matter improperly placed before the jury; and (3) move for a mistrial."). Accordingly, we find Appellant did not preserve error for review as to this alleged instance of prosecutorial misconduct.

7

Appellant argues that irrespective of preservation of error, "[w]here there is serious and continuing prosecutorial misconduct that undermines the reliability of the factfinding process . . . resulting in deprivation of fundamental fairness and due process of law, the defendant is entitled to a new trial even though few objections have been perfected." *Rogers v. State*, 725 S.W.2d 350, 360-61 (Tex. App.—Houston [1st Dist.] 1987, no pet.)). Although we agree with our sister court in Houston, we do not find that to be the case here.

Sergeant Fernandez was questioned as to his experience in crime scene investigation, specifically, his familiarity with firearms. Forensics was heavily discussed at trial by both sides. At the beginning of trial, when asked what produces gunshot stippling, the medical examiner explained:

> When the bullet comes out of the gun, it does so with other material, which is the gunpowder. There's going to be unburned gunpowder, which is . . . the burned gunpowder -- that is the soot -- and the unburned gunpowder, which is bigger and creates what is called stippling. It's an abrasion of the skin, a scrape.

Stippling allows an estimate of the distance of a gun from a body, which here, was particularly relevant to the defense's theory this was a suicide and not a murder—i.e., the lack of stippling weakened the defense's theory Santana committed suicide. The deputy medical examiner concluded there was no stippling. Sergeant Fernandez explained, "If someone shoots themselves at a close distance, you're going to see a lot of stippling." Sergeant Fernandez further explained and when asked whether he believed Santana's death was a suicide, he answered in the negative.

In our review, the State offered Sergeant Fernandez's testimony to prove the lack of stippling to indicate the death was a murder and not a suicide. This context, along with the context of the line of questioning at issue, we find the prosecutor's comment that crime scene investigators are on the side of the good guys did not impute guilt to Appellant, as Sergeant Fernandez testified

8

as a crime scene expert on stippling and rendered his opinion as to whether Santana's death was a suicide or homicide. Given the context of the line of questioning and the absence of any indication the jury was influenced by it, we do not believe the prosecutor's sidebar remark was of such a character that the harm, if any, resulted in the deprivation of fundamental fairness and due process of law.

## 2. Burden Shifting Objection

The second instance of alleged prosecutorial misconduct occurred during the State's opening statement, in which the following occurred:

| | |
|---|---|
| The State: | You are going to hear from Perla Castro, who was Santana's sister. She is going to tell you that Santana confided in her that the defendant was jealous, possessive, wouldn't let her answer her phone if her family was calling her if he was there; made her get rid of her Facebook; threatened her on Facebook, saying that, if he caught her cheating, he was going to kill her. You will also hear evidence that the defendant owned a gun. You will see him holding a gun, and you will see him pointing it recklessly at Santana. *You might not hear from the defendant. You might not hear his testimony in this trial, but you are going to hear a statement.* (emphasis added) |
| Defense Counsel: | Objection, Your Honor. She doesn't know whether she is going to hear from the defendant or not and shouldn't comment on it. That's commenting on whether -- you know, that's trying to shift the burden to us that we're supposed to put him on. And she doesn't have any business commenting on whether [co-counsel] and myself are going to decide to put my client on the stand. But that's no longer a road map, what she is giving. She is trying to argue and trying to shift the burden. I object strenuously. |
| The Court: | All right. Sustained. |

. . .

9

| Defense Counsel: | Excuse me, Your Honor. Could I have an instruction to the jury to disregard what Counsel last said. |
|---|---|
| The Court: | Yes. You can disregard any comment about the defendant. The jury is well aware of the law on that point. Go ahead. |

We again begin by considering whether Appellant has preserved error on appeal. *See Jimenez*, 240 S.W.3d at 403. Appellant's trial objection alleged the prosecutor was attempting to shift the burden, arguing outside the confines of a roadmap, while the complaint on appeal is prosecutorial misconduct due to violation of the Fifth Amendment's right against self-incrimination. We find the trial objection does not comport with Appellant's complaint on appeal. Thus, we find Appellant failed to preserve error.

In any case, even if we construe Appellant's objection liberally and find it did alert the trial court of an alleged violation of Appellant's Fifth Amendment right against self-incrimination, the argument fails. It is well settled that a prosecutor's statements constitute a comment on a defendant's failure to testify only if the prosecutor manifestly intended the comment to be, or the comment was of such character that a typical jury would naturally and necessarily take it to be, a comment on the defendant's failure to testify. *See Wead v. State*, 129 S.W.3d 126, 130 (Tex. Crim. App. 2004). Here, the prosecutor's statement was an attempt to emphasize that irrespective of whether Appellant testified, the jury was going to hear a specific statement. In our view, the prosecutor intended to point out to the jury they could anticipate a specific piece of evidence. We do not find the prosecutor's opening statement to be a clear comment regarding Appellant's right to not testify and suggesting any failure to testify should be held against him.

Nevertheless, Appellant timely objected to the prosecutor's statement and requested an instruction to disregard. The trial court sustained the objection and instructed the jury to disregard

the prosecutor's statement.[1] We generally presume the jury followed the trial court's instructions in the manner presented. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) (en banc). Although the presumption is rebuttable, Appellant has pointed to no evidence to rebut that presumption. *See id.* We therefore presume the jury followed the court's instructions and did not consider the statement in reaching a verdict. *See id*. To reiterate, Appellant sought relief and was granted the requested relief. *See Wead*, 129 S.W.3d at 129 (finding a reasonable trial judge could have concluded that an instruction to disregard would effectively remove any possible prejudice caused by the prosecutor's alleged failure to testify comment). Accordingly, any resulting harm, was cured. *See id.* Appellant did not further object and failed to move for a mistrial following either the alleged failure to testify comment or following the trial court's instruction to disregard. *See Koller v. State*, 518 S.W.2d 373, 375 (Tex. Crim. App. 1975) (finding error was preserved when defense counsel objected, requested an instruction to the jury to disregard, and moved for a mistrial immediately following each of the prosecutor's alleged failure to testify comments); *see Daniels v. State*, 708 S.W.2d 532, 533 (Tex. App.—Dallas 1986, no pet.) ("In order to preserve possible error for review, appellant's counsel must object, request an instruction to disregard, and make a motion for a mistrial following *each* objectionable comment.") (citing *Koller v. State*, 518 S.W.2d at 378). We further find error was not preserved because Appellant failed to move for a mistrial.

### Prosecutorial Misconduct Conclusion

In conclusion, considering the allegations of prosecutorial misconduct in light of the record as a whole, Appellant failed to preserve error. Moreover, even construing his allegations as

---

[1] Appellant complains on appeal about the wording of the trial judge's instruction to disregard. However, Appellant was required to have complained at trial, and his failure to do so constitutes waiver on appeal. *See* TEX. R. APP. P. 33.1(a).

prosecutorial misconduct, we do not find, but for the remarks, no conviction would have occurred. *See Jimenez*, 240 S.W.3d at 402. Accordingly, Issue Three is overruled.

## ADMISSION OF EVIDENCE

In Issue Four, Appellant claims the trial court abused its discretion by admitting social media messages which the State attributed to Appellant, and were used to link Appellant to the murder of Santana.[2] Appellant challenges the lack of authentication, arguing there is no showing of who sent the messages, which in turn creates a hearsay issue due to the unreliable nature of the social media messages. We disagree.

### *Standard of Review and Applicable Law*

A trial court's decision on the admission of evidence is reviewed under an abuse of discretion standard. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). A trial court's ruling will not be reversed unless that ruling falls outside the zone of reasonable disagreement, and a reviewing court affords great deference to a trial court in its decision to admit evidence. *Id.* at 760. If a trial court's ruling of the admission of evidence is correct on any theory of law applicable to the case, it should be sustained. *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002) (citations omitted).

To satisfy the requirement of authenticating or identifying evidence, a proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is. TEX. R. EVID. 901(a). Evidence may be authenticated by several ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated

---

[2] It is not quite clear which admitted exhibits Appellant complains of on appeal. Throughout Appellant's argument, he refers to the complained of evidence as "social media messages" and "social media statements." Although the State published and admitted exhibits beyond the following, Appellant does specifically reference Exhibits 106B, 106D, 106E, 106F, 107, 111, and 112. Accordingly, we limit our analysis to Exhibits 106B, 106D, 106E, 106F, 107, 111, and 112.

12

evidence, or by circumstantial evidence. TEX. R. EVID. 901(b)(1), (3)–(4). The Texas Court of

Criminal Appeals has explained:

> Like our own courts of appeals here in Texas, jurisdictions across the country have recognized that electronic evidence may be authenticated in a number of different ways consistent with Federal Rule 901 and its various state analogs. Printouts of emails, internet chat room dialogues, and cellular phone text messages have all been admitted into evidence when found to be sufficiently linked to the purported author so as to justify submission to the jury for its ultimate determination of authenticity.

*Tienda v. State*, 358 S.W.3d 633, 639 (Tex. Crim. App. 2012). Thus, the ultimate question of

whether an item of evidence is what its proponent claims is a question for the fact finder. *Id.* at

638. In performing its gate-keeping function, the trial court itself need not be persuaded that the

proffered evidence is authentic; rather, the preliminary question to be decided by the trial court is

simply whether the proponent of the evidence has supplied facts that are sufficient to support a

reasonable jury determination that the evidence he has proffered is authentic. *Id.*

### *Applicable Facts*

Outside of the jury's presence, El Paso Police Detective Zachary Kiesel began his

testimony by discussing two Facebook accounts—one under the name "Sparkz Daspade" (Sparkz)

and the other under the name "Sur Up." Records of the Facebook accounts contained incriminating

information and the State maintained these Facebook accounts belonged to Appellant.

Detective Kiesel testified a warrant was obtained for the two Facebook accounts and after

Facebook received the search warrants and processed the records, the records were then sent to the

law enforcement portal. He explained that when Facebook sends records to the law enforcement

portal, Facebook also attaches a certificate of authenticity. As the assigned case agent, Detective

Kiesel reviewed the records to determine what was pertinent to the investigation. He found

conversations referencing Santana, conversations referencing the murder, and photographs of Appellant on the records confirming that the account holder was Appellant.

While still outside the presence of the jury, the State published a series of messages obtained from the two Facebook accounts for the limited purpose of authentication. The trial court ultimately found an indicia of authenticity was present and admitted the evidence over Appellant's hearsay and lack of authentication objections. The trial court then allowed the jury back into the courtroom and provided the following instruction:

> Ladies and gentlemen of the jury, you are about to listen to some evidence. And it's under these names of -- two different names, Sparkz Daspade and Sur Up are names that are used in these messages. And I'm instructing you that if you believe that -- and it's you believe -- that Sur Up and/or Sparkz Daspade are the defendant, then you can consider that evidence for any purpose you feel assists you in determining the guilt or not guilt of the defendant. But if you do not believe that the defendant is Sparkz Daspade or Sur Up, then you should not use it as any evidence whatsoever. Okay? So proceed.

*Analysis*

We begin our analysis with a detailed account of the contents of each exhibit, along with context of the State's authentication of those exhibits during trial.

- **Exhibit 106B**

Exhibit 106B is a Facebook Business Record which shows that for the Sur Up Facebook account, the date of birth provided by the account holder at the time of production was May 30, 2000, which is Appellant's date of birth. Exhibit 106B also lists the gender of the Sur Up account holder as male.

During Detective Kiesel's testimony, the following was asked:

| | |
|---|---|
| The State: | And now I'm showing you State's Exhibit 106B. Can you give us the page number? |
| Detective Kiesel: | Page 2507. |

14

| | |
|---|---|
| The State: | Can you please tell us what this page is referring to? |
| Detective Kiesel: | Shows date of birth by the account holder at the time of the production. Date of birth 05/30 of 2000. |
| The State: | And do you know whose date of birth that is? |
| Detective Kiesel: | I believe that belongs to the defendant. |

- **Exhibit 106D**

Exhibit 106D is a Facebook Business Record that depicts messages sent between Sur Up and another individual, GuttaKing Banks, on July 18, 2019. The messages refer to Perla, Santana's sister. The following was exchanged:

> **Author** GuttaKing Banks (100024436543302)
> **Sent** 2019-07-18 05:40:44 UTC
> **Body** I gotta watch my back now . . . Perla thinks she can get the "OGs" on me because I don't let anyone talk down on h and cuz I said your innocent . . . lmfao lil girl is an idiot
>
> **Author** Sur Up (100039635850135)
> **Sent** 2019-07-18 05:43:01 UTC
> **Body** That lil hoe not about sh[*]t . . . tell her i said she can be next lmsoo

During Detective Kiesel's testimony, the following was asked:

| | |
|---|---|
| The State: | Okay. 106B. When you said -- you said that you were making reference that this was, in fact, what you believed to be the defendant; is that correct? |
| Detective Kiesel: | That is correct. |
| The State: | [Y]ou were talking that somebody had been saying -- King Banks. Do you remember that on the messages that were sent? |
| Detective Kiesel: | Yes, sir. There was a conversation with a person, GuttaKing Banks. |
| The State: | And who is that? |

Detective Kiesel:                 It was a Facebook profile. I don't know who the actual person is.

- **Exhibit 106E**

Exhibit 106E is a Facebook Business Record that depicts a series of searches made by the account holder on July 16, 2019. During Detective Kiesel's testimony, the following was asked:

The State:                        And I'm showing you now State's Exhibit Number 106E. Could you give us the page number, please?

Detective Kiesel:                 Page 157.

The State:                        And what does this reference here? What is this account?

Detective Kiesel:                 On July 16th, 2019, the account searched for MK Santana, which would be the Facebook account associated with the victim.

- **Exhibit 106F**

Exhibit 106F is a Facebook Business Record that depicts a series of messages between Sur Up and GuttaKing Banks on July 16, 2019. The following was exchanged:

**Author** Gutta King Banks (100024436543302)
**Sent** 2019-07-26 18:37:18 UTC
**Body** Wtf no way how if that had nothing to do with the bullsh[*]t that happened

**Author** SurUp (100039635850135)
**Sent** 2019-07-26 18:37:45 UTC
**Body** They trying to say I was in my infinity that day

**Author** SurUp (100039635850135)
**Sent** 2019-07-26 18:37:59 UTC
**Body** Like na till after lmao

**Author** GuttaKing Banks (100024436543302)
**Sent** 2019-07-26 18:38:06 UTC
**Body** How is that if they have the truc[k] with the blood

**Author** SurUp (100039635850135)
**Sent** 2019-07-26 18:39:26 UTC
**Body** They took the truck but sh[*]t cleaned I think so

16

**Author** GuttaKing Banks (100024436543302)
**Sent** 2019-07-26 18:47:38 UTC
**Body** Yeah but they can still test it all and if they pull the interior apart it'll be seen

**Author** SurUp (100039635850135)
**Sent** 2019-07-26 18:48:09 UTC
**Body** Fu[*]k it they can suck my di[*]k tbh

**Author** SurUp (100039635850135)
**Sent** 2019-07-26 18:48:24 UTC
**Body** It taking em long if they really cared

During Detective Kiesel's testimony, the following was asked regarding Exhibit 106F:

| | |
|---|---|
| The State: | Okay. And now I'm showing you State's Exhibit 106F. Could you give us the page number, please? |
| Detective Kiesel: | Page 593. |
| The State: | Okay. And could you explain to us what this record references? |
| Detective Kiesel: | It's another conversation. And during the conversation that happened on 7/26/2019 at 18:37:18 UTC time, GuttaKing says, "Wtf" -- which I believe to mean "what the fu[*]k" -- "no way how if that had nothing to do with the bullsh[*]t that happened." Sur Up says, "They trying to say I was in my Infinity that day." Sur Up then says, "Like na till after lmao." I believe "lmao" means "laugh my a[*]s off." |
| Defense Counsel: | Again, Your Honor, this is a hearsay objection also as to GuttaKing Banks, Your Honor, and speculation as to what he said. |
| The Court: | All right. Overruled. |
| Detective Kiesel: | GuttaKing Banks then says, "How is that if they have the true – truc[k] with the blood?" Sur Up says, "They took the truck but sh[*]t cleaned I think so." GuttaKing Banks says, "Yeah, but they can still test it all and if they pull the interior apart it will be seen." Sur Up says, "Fu[*]k it they can suck my di[*]k tbh," |

17

which I believe to mean "to be honest." Sur Up then says, "It taking em long if they really cared."

- **Exhibit 107**

Exhibit 107 is a Facebook Business Record that depicts a series of messages between the Sparkz account holder and MK Santana, which was Santana's Facebook account. The following was exchanged:

**Author** Sparkz Daspade (100023532069981)
**Sent** 2019-06-23 08:45:09 UTC
**Body** Like if u wanna be a hoe lmk and ill leave

**Author** Sparkz Daspade (100023532069981)
**Sent** 2019-06-23 08:44:59 UTC
**Body** I just dont wanna have to fu[*]k u over and kill ya for cheating

**Author** Mk Santana (100034323226745)
**Sent** 2019-06-23 08:42:56 UTC
**Body** Fym

**Author** Mk Santana (100034323226745)
**Sent** 2019-06-23 08:42:53 UTC
**Body** lma stick wit you foevaa

**Author** Mk Santana (100034323226745)
**Sent** 2019-06-23 08:42:41 UTC
**Body** I know you will why you think Ion be doin allat

**Author** Sparkz Daspade (100023532069981)
**Sent** 2019-06-23 08:38:00 UTC
**Body** Ill shoot any nihha u fw on me or aftrr me

**Author** Mk Santana (100034323226745)
**Sent** 2019-06-23 08:37:46 UTC
**Body** I kno you bout it

**Author** Mk Santana (100034323226745)
**Sent** 2019-06-23 08:37:38 UTC
**Body** Smfh

**Author** Mk Santana (100034323226745)
**Sent** 2019-06-23 08:37:35 UTC
**Body** I ain't lackin on god

18

**Author** Sparkz Daspade (100023532069981)
**Sent** 2019-06-23 08:37 :09 UTC
**Body** Mhmm smhh i just wanna catch u lakkinh aint gone lie just so i can air sh[*]t out

**Author** Mk Santana (100034323226745)
**Sent** 2019-06-23 08:36:39 UTC
**Body** But you

**Author** Mk Santana (100034323226745)
**Sent** 2019-06-23 08:36:35 UTC
**Body** No one

**Author** Mk Santana (100034323226745)
**Sent** 2019-06-23 08:36:30 UTC
**Body** Ofc I have

**Author** Mk Santana (100034323226745)
**Sent** 2019-06-23 08:36:25 UTC
**Body** Wtf

During Detective Kiesel's testimony, the following exchange occurred regarding Exhibit

107:

The State: And now I'm showing you State's Exhibit 107. Could you please read the page on that, please?

Detective Kiesel: Page 5175.

The State: Okay. Could you tell us what this page is referencing?

Detective Kiesel: This is a conversation between the defendant and the victim.

The State: And could you read to us what the conversation is?

Detective Kiesel: On June 23rd, 2019, author Sparkz Daspade sent a message saying, "Like if you wanna be a hoe lmk and I'll leave." I believe "lmk," through experience, means "let me know." Sparkz Daspade then says, "I just don't wanna have to fu[*]k you over and kill ya for cheating." MK Santana, which is the victim's Facebook, replies, "Fym." I believe that to mean

19

"Fu[*]k you mean," as in "What do you mean?" Victim Santana then says, "Lma [sic] stick with you forever." Santana then says, "I know you will why you think I will be doing all that?" Sparkz Daspade says, "I'll shoot any nihha u fw on me or after me." MK Santana says, "I know you bout it." Santana then says, "Smfh," which I believe means "shake my fu[*]king head." Santana then says, "I ain't lackin on God." Sparkz Daspade then says, "Mhmm smhh I just wanna catch you lakkin, ain't gonna lie, just so I can air sh[*]t out." Santana then says, "But you." Santana then says, "No one." "Ofc [of course] I have." Santana then says, "Wtf."

- **Exhibit 111**

Exhibit 111 is the "Certificate of Authenticity of Domestic Records of Regularly Conducted Activity" from Facebook. Exhibit 111 certified: 1) Ryan Spector was the authorized custodian of records for Facebook and was qualified to certify Facebook's domestic records of regularly conducted activity; 2) Ryan Spector reviewed the records produced by Facebook in response to the search warrant received; 3) that the records provided were an exact copy of the records that were made and kept by the automated systems of Facebook in the course of regularly conducted activity, the records were saved in electronic format after searching Facebook's automated systems in accordance with the above-specified legal process, the records were made at or near the time the information was transmitted by the Facebook user; and 4) as custodian of records, Ryan Spector declared under penalty of perjury that the foregoing certification was true and correct to the best of his knowledge.

During Detective Kiesel's testimony, the following exchange regarding Exhibit 111 occurred:

| The State: | So I'm showing you State's Exhibit 111. Can you tell us what this is? |

20

| | |
|---|---|
| Detective Kiesel: | That is an additional certificate of authenticity of records from Facebook that would have been attached to the other account. |

- **Exhibit 112**

Exhibit 112 is a Facebook Business Record of the Sparkz account. It shows the date of last activity on that account as July 13, 2019, which was relevant to the State's case because the murder occurred on that same date, then three days later, the Sur Up Facebook was created, which the State argued also belonged to Appellant. During Detective Kiesel's testimony, the following exchange regarding Exhibit 112 occurred:

| | |
|---|---|
| The State: | And I'm showing you now State's Exhibit 112, which also contains 15 pages. But could you read the page number on this? |
| Detective Kiesel: | Page 1. |
| The State: | And then can you read the name for us? |
| Detective Kiesel: | First name is Sparkz, S-p-a-r-k-z. Last name, Daspade, D-a-s-p-a-d-e. |
| The State: | And I'm still showing you State's Exhibit 112. Can you read the page number for us? |
| Detective Kiesel: | Page 3. |
| The State: | And then could you tell us what this refers to here? |
| Detective Kiesel: | This identifies the IP address for the account that was accessed on July 13th, 2019. |
| The State: | Okay. And is it going -- how is the timing indicated? What's the next-- |
| Detective Kiesel: | It goes -- the most current is front -- is forward. And you go back in time as you go down the record's pages . . . That would be the most recent time that it was accessed. |

| | |
|---|---|
| The State: | And I'm still showing you State's Exhibit 112. Can you read the page number for us, please? |
| Detective Kiesel: | Page 14. |
| The State: | And then could you tell us what that -- the bottom, what that refers to there? |
| Detective Kiesel: | Again, showing that IP address that accessed the account. The date is going to be June 1st, 2019. |

In his statement to police, Appellant provided his date of birth as May 30, 2000. Throughout trial, testimony was offered that several individuals referred to Appellant as "Sparkz". This evidence, along with the following combination of facts—1) Exhibit 106B: the date of birth for the Sur Up account holder, May 30, 2000, was the same as that of Appellant, May 30, 2000, as admitted by him in his statement to police; 2) Exhibit 106B: the listed gender as male for the Sur Up account holder, which matches Appellant's gender; 3) Exhibit 106D: the Sur Up account holder stating: "That lil hoe not about sh[*]t. [T]ell her I said she can be next Imsoo" (in reference to Santana's sister, Perla, which insinuates that Perla is only "next" because the first one killed by Appellant was Santana); 4) Exhibit 106E: a search made by the Sur Up account holder for MK Santana, which was Santana's Facebook account; 5) Exhibit 106D: in reference to the authorities taking Appellant's truck which contained traces of blood, Appellant responded that "[t]hey took the truck but sh[*]t cleaned I think so[,]" to which GuttaKing Banks responded, "[y]eah but they can still test it all and if they pull the interior apart it'll be seen"; 6) Exhibit 107: the Sparkz account holder explicitly threatening Santana that he would kill her if she cheated, and would shoot anyone she involved herself with while they were together, or after him if they were to break up; and 7) Exhibit 112: the date of last activity on the Sparkz account was July 13, 2019, which is the exact day of the murder, then two days later, a new Facebook account under the name Sur Up was

22

created—is all sufficient to support a finding by a rational jury that the two Facebook accounts belonged to Appellant.

This is ample circumstantial evidence—taken collectively with all of the individual, particular details considered in combination—to support a finding that sufficient authentication was provided. Because there was sufficient circumstantial evidence to support a finding that the exhibits were what they purported to be—that the Facebook accounts belonged to Appellant and that he maintained them—we affirm the trial court's conclusion that the State supplied sufficient authentication to support a reasonable jury determination that the Facebook accounts were owned and maintained by Appellant. *See Tienda*, 358 S.W.3d at 638 (noting the ultimate question of whether an item of evidence is what its proponent claims is a question for the fact finder). Accordingly, the trial court did not abuse its discretion in admitting Exhibits 106B, 106D, 106E, 106F, 107, 111, and 112. Issue Four is overruled.[3]

---

[3] As to Appellant's insistence that the lack of authentication created a hearsay issue, we disagree. The State supplied sufficient authentication to support a reasonable jury determination that the Facebook accounts were owned and maintained by Appellant. A statement offered against an opposing party made in his individual capacity is not hearsay. *See* TEX. R. EVID. 801(e)(2)(A). An admission of a party opponent, which is a hearsay exclusion, provides that a statement is not hearsay if it is offered against a party to the proceeding and is that party's own statement. *Templeton v. State*, 629 S.W.3d 616, 629 (Tex. App.—Eastland 2021, no pet.). We can presume, by way of the jury's guilty verdict, that the jury determined the Facebook accounts belonged to Appellant and were maintained by him, and it is uncontested that the evidence was used against Appellant at trial. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (en banc) (noting credibility determination of such evidence is solely within the jury's province, which the jury is free to accept, and a guilty jury verdict is an implicit finding that the jury rejected the defendant's theory); *see Templeton*, 629 S.W.3d at 629-30 ("To satisfy the admissibility requirements for an admission of a party-opponent under Rule 801(e)(2)(A), it must be shown that the admission is the party-opponent's own statement and that it is offered against him. . . . [T]he admission only needs to be offered as evidence against the party who made the admission."). Thus, because there was sufficient authentication to support a reasonable jury determination that the Facebook accounts were owned and maintained by Appellant, and because the trial court instructed the jury to only consider the evidence if it found the Facebook accounts belonged to Appellant, the evidence was admissible. TEX. R. EVID. 801(e)(2)(A).

We further find error in the admission of the evidence, if any, was non-constitutional and not subject to reversal. The erroneous admission or exclusion of evidence is generally non-constitutional error governed by Rule 44.2(b) of the Texas Rules of Appellate Procedure. *Melgar v. State*, 236 S.W.3d 302, 308 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); TEX. R. APP. P. 44.2(a). Non-constitutional error that does not affect the substantial rights of the accused must be disregarded and does not warrant reversal. *See* TEX. R. APP. P. 44.2(b). When evaluating harm from non-constitutional error resulting from the admission or exclusion of relevant evidence, we must decide whether the error had a substantial or injurious effect on the jury verdict. *Melgar*, 236 S.W.3d at 308. Reversal is required if

**SUPPLEMENTAL ISSUE**

In Issue Five, Appellant points us to allegations of bias, grouped into what we discern as fourteen sub-parts, to establish that the Honorable William E. Moody of the 34th Judicial District of El Paso County, Texas, was biased and deprived him of due process and a fair trial. However, as a threshold matter, we find Appellant has not preserved this supplemental issue for review because Appellant raised it for the first time on appeal in a supplemental brief without seeking leave.

On January 9, 2023, Appellant filed his original brief, raising four issues for review. On February 6, 2023, without requesting leave of this Court to raise a new issue, Casas filed a supplemental brief complaining that he was not afforded due process and a fair trial due to the trial judge's alleged bias.

---

the reviewing court has "grave doubt that the result of the trial was free from the substantial effect of the error." *Barshaw v. State*, 342 S.W.3d 91, 94 (Tex. Crim. App. 2011). "Grave doubt" meaning, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.*

Exhibits 106B, 106D, 106E, 106F, 107, 111, and 112 were merely a fraction of the overwhelming evidence admitted against Appellant at trial. Evidence was admitted that Appellant had been seen with a cocked .45 caliber gun. Santana was killed by a .45 caliber bullet. There was also testimony that on different occasions, Appellant pointed a gun at Santana, which Appellant himself admitted. No gun or spent casing was found at the scene, and the jury was free to use deductive reasoning. In Appellant's statement to the police, Appellant claimed that right before Santana's death, he and Santana were arguing, and Santana had a gun in her hand. According to Appellant, "that's when we started arguing. I pushed her off. I mean, that's when I tried to leave and I heard the gunshot. . . . I was already halfways out the door, literally, with my -- I had a duffel bag in my right hand. And I was opening the door with my left. I heard the gunshot. . . . I went back inside. That's when I saw her on the floor." Appellant fled the scene, and also fled to Mexico and was arrested on August 9, 2019 by Mexican federal police and was turned over to U.S. authorities. Furthermore, there was a plethora of exhibits admitted relating to the Facebook accounts—beyond the challenged exhibits—including a photo sent by the Sparkz account holder. The photo was of a box of .45 caliber bullets, specifically the "Black Hills" brand, which were found in Santana's bedroom closet in a purse. This evidence, along with examination of the record as a whole, we find the result of the trial was free from the substantial affect of the alleged error and does not rise to the level of grave doubt. There was ample evidence of Appellant's guilt, beyond Exhibits 106B, 106D, 106E, 106F, 107, 111, and 112. Accordingly, error in the admission of the challenged evidence, if any, was non-constitutional and is not subject to reversal.

We have previously held that new points of error raised by an appellant in a supplemental brief are not properly presented for appellate review. *Ontiveros v. State*, 890 S.W.2d 919, 931 (Tex. App.—El Paso 1994, no pet.). In *Ontiveros*, we specifically held,

> Finally, in a supplemental brief, Ontiveros raises a point of error not raised in the original brief, and does so without obtaining leave of court to raise a new point of error. Points of error raised by an appellant in a supplemental brief which were not raised in the original brief are not properly presented for appellate review. We overrule this supplemental point of error.

*Id.* (citations omitted); *see Perkins v. State*, 905 S.W.2d 452, 453 (Tex. App.—El Paso 1995, pet. ref'd) ("This Court has discretion whether to consider new matters raised in a supplemental brief or a motion for rehearing."). The Texas Court of Criminal Appeals has also held that a point of error raised for the first time in a supplemental brief was not preserved for review where it was a new point of error not raised in appellant's original brief. *Coleman v. State*, 632 S.W.2d 616, 619 (Tex. Crim. App. [Panel Op.] 1982).

Appellant raised his fifth issue in a supplemental brief without first obtaining leave of court to raise a new point of error. Accordingly, Appellant has not preserved Issue Five for our review. This supplemental issue is overruled.

## **CONCLUSION**

For these reasons, we affirm.


YVONNE T. RODRIGUEZ, Chief Justice

May 31, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.

(Do Not Publish)

25